UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIDGETT LAMAR,

        Plaintiff,

vs.

PROCTER & GAMBLE
DISTRIBUTING LLC,

        Defendant.

_____/

Civil Action No.
13-CV-13380

Honorable Patrick J. Duggan

## <u>OPINION AND ORDER GRANTING DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT</u>

### I.  INTRODUCTION

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq*., and the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*  Plaintiff Bridgett Lamar claims that she was placed on a performance improvement plan (PIP) and subsequently terminated from her employment with Defendant Procter & Gamble Distributing LLC (P&G) because of her race (African American), pregnancy, use of FMLA leave, and complaints of discrimination.  P&G claims that the PIP and termination resulted solely from Plaintiff's poor work performance.

Now before the Court is P&G's motion for summary judgment. The matter is fully briefed and the Court heard oral argument on January 22, 2015. For the reasons that follow, the Court will grant the motion.

## II.  BACKGROUND

Plaintiff began working for P&G in March 2010 as a veterinary account manager (VAM) in P&G's pet care division. Banker Decl. ¶¶ 2, 4; Pl. Dep. at 72. As a VAM, Plaintiff's job was to sell products manufactured by P&G to veterinary practices within her designated region, the central region, which encompassed most of Michigan's lower peninsula. Pl. Dep. at 40-41, 51-52, 54-55. For the first two years of her employment, Plaintiff's direct supervisor was Eleanor (Marci) Banker, a veterinary account executive (VAE); Plaintiff's so-called "one-up" manager was Steve Giovanni, who was in charge of the central region. Banker Decl. ¶¶ 4, 9; Giovanni Dep. at 77-79. Giovanni, in turn, reported to associate director Tommy Walsh, who was responsible for the operation of P&G's pet care division nationally. Walsh Decl. ¶ 2; Giovanni Dep. at 137; Taney Dep. at 10-11.

As a VAM, Plaintiff was required to visit veterinary clinics in her region to promote and sell P&G products. Lamar Dep. Ex. 3-4, 8. "VAM Scorecards" were used by P&G to evaluate the sales performance of each VAM relative to other VAMs around the country. Giovanni Decl. ¶ 4. VAMs also received annual performance evaluations after the close of each fiscal year, which ran from July 1

2

to June 30, through "work and development plans."  Banker Decl. ¶ 12.  Work and development plans were completed by each VAM and his or her VAE, and then reviewed and approved by Giovanni.  Banker Dep. at 81; Giovanni Dep. at 81-82.  Finally, each fiscal year P&G rates the performance of VAMs on a scale of one to three, with a one rating reflecting a performance within the top 20% relative to the employee's peer group, a rating of three reflecting a performance within the bottom 6% relative to the employee's peer group, and a rating of two reflecting performances in between.  Erwin Decl. ¶¶ 8-9.

Plaintiff's performance evaluation for fiscal year 2010-2011, her first full fiscal year with P&G, contained positive comments.  However, despite these positive remarks and her receipt of a "meeting expectations" rating, Banker noted on the evaluation that Plaintiff "delivered 3 out of 8 of her deliverables [i.e., performance goals] in [fiscal year 2010-2011]."  Pl. Dep. Ex. 11.  In addition, Plaintiff received a performance rating of two for fiscal year 2010-2011, indicating that her performance relative to her peers was better than the bottom 6% but worse than the top 20%.  Erwin Decl. ¶ 12.  Under P&G's VAM Scorecard rating system, Plaintiff ranked 34 out of 38 VAMs nationwide, with a rating of one being the best.  Giovanni Decl. ¶ 6.  According to Giovanni, "the Michigan region [Plaintiff] was responsible for went from being one of the top 15 performing regions – her predecessor's VAM ranking as of June 2009 – to one of the five worst performing

3

regions in the country." *Id.* ¶ 7.  VAM Scorecard rankings as of June 2009 indicate that Plaintiff's predecessor, Michelle Swigart, who managed the same territory as Plaintiff, ranked 15 out of 36 VAMs nationwide.  *Id.* at Ex. C; Banker Decl. ¶ 6. Thus, P&G's objective performance metrics indicate that under Plaintiff's watch, performance for Plaintiff's region dropped from about average to below average. Banker Decl. ¶ 6; Giovanni Decl. ¶ 7, Ex. C.

After the 2010-2011 fiscal year ended on June 30, 2011, the relationship between Plaintiff and Banker began to deteriorate.  At around this time, Banker grew concerned that Plaintiff was not appropriately inputting her sales activity in "Salesforce.com," P&G's internal sales tracking system, and was not confident about Plaintiff's "ability to relate all the product knowledge . . . to our customers." Banker Dep. at 315.  Regarding the requirement that VAMs input their sales activities in Salesforce.com, Plaintiff testified that "at the beginning" of her employment, she was told to log only "things that were important" into Salesforce.com, and was not told to log all of her sales activities in Salesforce.com until March 2012.  Pl. Dep. at 64-66.  However, Banker sent an email on June 23, 2011, right before the end of the 2010-2011 fiscal year, to the VAMs under her supervision, including Plaintiff, reminding them that "[t]his is your last chance to get all your calls . . . recorded in Salesforce."  Pl. Dep. at Ex. 8.  Additionally, Banker sent another email on July 1, 2011, right after the close of the 2010-2011

4

fiscal year, telling VAMs to "LOG EVERYTHING IN SALESFORCE" and warning: "This is not an area that will allow for any flexibility this year." *Id.* at Ex. 9. Notwithstanding Plaintiff's testimony, the July 1 email demonstrates that VAMs were required to log all sales activity in Salesforce.com beginning July 1, 2011.

As mentioned, Banker perceived problems in the manner Plaintiff was logging her sales hours in Salesforce.com beginning July 1, 2011, which was when the requirement to log all sales activity became mandatory. Banker Dep. at 315; Pl. Dep. at Ex. 9. Banker testified that "there were many days [where] there was nothing logged" and "some months where there were more phone calls made than in-person calls made," which concerned Banker because "this was a field-selling role that required you to have a relationship with the customers, which meant that you needed to leave your home to . . . build on that relationship." Banker Dep. at 318. On August 23, 2011, Banker sent an email to Plaintiff informing her that she "can't understand how you [Plaintiff] are logging things [in Salesforce.com]," explaining to Plaintiff that she had logged more phone calls than in-person calls, and reminding Plaintiff that "[y]ou should have more in person calls than phone calls." Pl. Dep. Ex. 10. Although Plaintiff responded to Banker's email stating that "[a]ll calls in [Salesforce.com] are reflective of my work," *id.*, she admitted in her deposition that she did not comply with Banker's July 1, 2011 directive to

5

"LOG EVERYTHING IN SALESFORCE."  Pl. Dep. at 128.  When asked why, Plaintiff responded: "I just didn't."  *Id.*[1]

On January 5, 2012, Plaintiff and Banker spoke by phone.  According to Plaintiff, Banker was "disrespectful, rude, and demeaning," and told Plaintiff that her "counterparts were doing circles around [her]," that she "should be grateful for having a job," that she "didn't deserve the money that [she was] making," and that she "didn't love [her] job."  Pl. Dep. at 160-61.  Banker testified that she "had concerns about [Plaintiff's] performance . . . versus her peers that were hired within the same timeframe" and admits that she told Plaintiff that her peers – namely, male VAMs Mike Scovronski and Tyler Winters – "could run circles around her."  Banker Dep. 250.  However, Banker denies that she told Plaintiff that she thought Plaintiff was underpaid or that she did not like her job.  *Id.*

Plaintiff sent an email to Banker on February 6, 2012 reflecting on their phone conversation a month earlier.  In the email, Plaintiff wrote that statements made by Banker during the conversation "were disrespectful and in my opinion not conductive to a healthy working relationship," and proposed that they "move

---

[1]  In an affidavit submitted in connection with these summary judgment proceedings, Plaintiff attested that Banker told her not to log all of her sales calls in Salesforce.com from October 2011 to February 2012, in light of the fact that Plaintiff's "internet access was not always reliable."  Pl. Aff. ¶ 3.  However, when asked in her deposition why she did not log her hours in Salesforce.com during this time period, Plaintiff failed to mention that Banker told her not to.  Pl. Dep. 128.

forward and develop a stronger and healthier relationship and work towards the same goal each day." Banker Decl. Ex. A.

Also on February 7, 2012, Plaintiff sent an email to Lucy Klette in human resources requesting that the two discuss "a private matter." Pl. Ex. 13B. Plaintiff forwarded to Klette a copy of Plaintiff's February 6 email to Banker, and told Klette that the email was written "as a result of what I deem as verbal abuse and harassment for some time while I have been in this position." *Id.* Klette responded to Plaintiff's email on February 13, 2012, writing that she would "be happy to connect with you whenever I can to help resolve this conflict," but also noting that Allison Erwin was the primary human resources contact for Plaintiff's division. *Id.* Plaintiff and Klette spoke the next day; Plaintiff told Klette "about the issues that were going on" between her and Banker and about "the inappropriate conversation that took place" on January 5, 2012, which Plaintiff "felt . . . was discriminatory and harassing." Pl. Dep. at 160. At some point after this conversation, Klette turned the matter over to Allison Erwin, who was the human resources manager responsible for VAMs. Klette Dep. at 70.

On February 23, 2012, Banker discussed Plaintiff's performance issues with Giovanni, Erwin, Klette, Walsh, and Karen LaBarre, P&G's regional manager. Pl. Ex. 13C. On February 27, 2012, Erwin emailed Plaintiff stating that she (Erwin) and Klette had spoken about Plaintiff's issues with Banker, and proposing a

7

conference call between Plaintiff, Banker, and Erwin.  Pl. Ex. 13D.  Plaintiff responded to Erwin's email on March 1, 2012, writing that she is uncomfortable with a conference call with Banker, as she feared that Banker would retaliate.  *Id.*

The teleconference between Plaintiff, Erwin, and Banker took place on March 2, 2012.   Erwin took detailed notes on what occurred during the conversation.  Erwin began by stating that both Banker and Plaintiff had concerns that they wanted to discuss, which is why Erwin scheduled the conference call, and asked Banker to lead the conversation.  All agreed that Plaintiff's concerns about Banker would be "table[d]" "until either the end of the meeting or for another time."  Banker stated that she was aware that Plaintiff had spoken to Klette and Erwin with confidential concerns, and encouraged Plaintiff to talk with human resources "anytime she may need something and that she has every right to do that, and that this phone call was about a specific issue unrelated to [Plaintiff's] call to HR."  Prior to the conference call, Banker emailed Plaintiff and Erwin a calendar showing an excessive number of days over a six-month period from July 1, 2011 to January 31, 2012 in which no in-person or telephonic sales calls were recorded in Saleforce.com.[2]  Erwin expressed concern and stated that she and Banker "needed

---

[2] The time period captured by the calendar was a six-month period *after* July 1, 2011 – the date Banker emailed Plaintiff and other VAMs telling them to "LOG EVERYTHING IN SALESFORCE" and warning that "[t]his is not an area that will allow for any flexibility this year."  Pl. Dep. at Ex. 9.  The time period captured also includes the five-month period (October 2011-February 2012) during

to understand what activity was occurring the days with little to no sales activity recorded." Plaintiff explained that "logging calls in Salesforce was not a deliverable [goal] expected of her" and that "she views Salesforce as a tool for recording information on clinics and looking up information for cold calls, but that people don't document every call they make and that she was never expected to." Plaintiff admitted that she did not record all of her activity in Salesforce.com. Erwin asked Plaintiff what unrecorded tasks she had completed during the time period in question to account for the days on which no sales activity was recorded in Salesforce.com. Plaintiff responded listing various tasks, and Erwin asked Plaintiff if she had verifying documentation. Banker explained the importance of inputting all activity in Salesforce.com and noted that this has always been a job expectation. Plaintiff responded that she now understood that this was an expectation and that she would log all activity going forward. Pl. Ex. 13E.

Banker then shared another concern: That Plaintiff's "travel to western Michigan is not as high as she would expect" and that Plaintiff had not spent enough "overnights" in that area. Plaintiff explained that she had traveled to western Michigan more times than reflected in Salesforce.com, and that she made day trips to Grand Rapids and did not stay overnight due to "budget constraints"

---

which Banker allegedly told Plaintiff that she need not log all of her sales calls in Salesforce.com.

facing P&G.  Plaintiff also explained that "she did not think travel should be an issue, given that the majority of her business is in southeast Michigan and that western and northern Michigan represent white space."  Plaintiff and Banker agreed that the two would jointly review Plaintiff's routing schedule and that "[Plaintiff] would use [Banker] as a resource in the future for guidance around appropriate travel percentages and schedules."  Erwin then summarized what had occurred during the conference and the plan going forward.  Erwin wrote that "they were not able to get to [Plaintiff's] concerns in the time allotted today" but that "she would separately set up a time" for the three to discuss those concerns.  Pl. Ex. 13E.

On March 5, 2012, Plaintiff emailed Erwin expressing her dissatisfaction and disappointment with the way in which her issues with Banker had been handled.  In the email, Plaintiff wrote that "[t]he issues that [Banker] brought to your attention are not relative to my objectives," "VAMs . . . are not mandated to log calls into Sales force and that is something that [Banker] herself does not adhere to," and that Plaintiff "should not be forced to complete a task that none of my fellow co-workers complete and neither does my superiors."  Plaintiff then inquired: "I would like to know how and why were my complaints ignored???  I did not feel like anything was accomplished in a positive manner and it makes me question how my issues of discrimination and [Banker] creating a hostile work

10

environment for the women on our team become a non-issue over [Banker] making up an complaint about me.  My reviews have all been positive and my numbers have been great and I enjoy my job."  Plaintiff wrote that "[t]he real issue is [Banker] has been very unprofessional with the comments that she has made to myself and about my fellow co-workers" and that "[s]he has used discrimination tactics towards the women on this team and she violated the code of ethics for a work place environment."  Plaintiff stated that she "brought this issue to HR and I would like to see that this issue is not ignored and that a complete investigation is completed."  Erwin responded to this email the same day, expressing her desire to speak to Plaintiff.  *Id.*

On March 7, 2012, Plaintiff emailed Klette expressing her belief that Banker retaliated against her for contacting human resources by making much of the fact that Plaintiff did not log all her sales activity in Salesforce.com.  Pl. Ex. 13G. Plaintiff also expressed disappointment that her issues with Banker were "completely ignore[d]," and conveyed her belief that human resources had allowed Banker to "deter the real issues" and "act out of rage" such that Banker is "not . . . accountable for the unprofessionalism and creating a hostile work environment." *Id.*  Klette forwarded Plaintiff's email to Erwin.  *Id.*  When asked in her deposition if she understood Plaintiff's March 7 email to Klette as lodging a complaint of discrimination, Erwin responded: "Probably.  Possibility."  Erwin Dep. at 289.

11

Erwin and Plaintiff spoke by phone on March 13, 2012.  *Id.* at 292-93; Erwin Decl. ¶ 4.  During the phone conversation, Erwin "assured" Plaintiff that Erwin would investigate Plaintiff's concerns regarding Banker and "keep them separate" from Banker's concerns about Plaintiff's performance."  Erwin Decl. ¶ 4. The next day, Erwin sent an email to Plaintiff confirming their phone conversation the previous day, writing: "I want to reiterate that I am looking into both the performance questions and your concerns about your working relationship with [Banker], both equally seriously and on parallel timing, but I am keeping the two issues separate, in terms of who I talk to and how I document the conversations." Def. Ex. 6A.  Erwin also informed Plaintiff that she and Giovanni "have some follow-up questions now that we have had a chance to review your documentation and the comments you shared with me yesterday," and sent Plaintiff an electronic conference call invitation.  *Id.*  However, Plaintiff refused to participate in the conference call, writing to Erwin in an email: "I am denying your [electronic] invite to further discuss, this has been racial discrimination and harassment I need to speak with the proper individuals to further investigate.  I will contact you at . . . a later date or someone else will be in contact with you."  Def. Ex. 6B.  This is the first time Plaintiff indicated that her discrimination complaints were based on race, as opposed to only gender.

On March 15, 2012, Plaintiff filed a formal complaint against Banker and Erwin through P&G's internal reporting system, known as "Alertline," complaining of non-sexual harassment and race and gender discrimination. Pl. Ex. 14. P&G took two actions after Plaintiff filed her Alertline complaint. First, it assigned two new human resources investigators from outside the pet care division to investigate: Hallam Sargeant and Dee Johnson. Sargeant Dep. at 55-56. Second, effective March 27, 2012, P&G reassigned Plaintiff to a different direct supervisor, Giovanni, in place of Banker, and appointed Mike Taney, the global human resources manager for P&G's pet care division, as Plaintiff's new human resources contact in place of Erwin. Giovanni Decl. ¶ 8. From this point forward, Banker had no involvement with Plaintiff for the duration of her employment at P&G. Banker Decl. ¶ 15; Giovanni Decl. ¶ 8.

Sargeant and Johnson investigated Plaintiff's Alertline complaint by reviewing documents and conducting interviews of Plaintiff, Banker, Giovanni, Deidre Scott (Plaintiff's peer), Janet Holthus (Plaintiff's peer), Mike Scovronski (Plaintiff's peer), and Michelle Swigart (Plaintiff's predecessor covering the same region and former direct report of Banker). Their findings and recommendations are summarized in a written report dated May 2, 2012. In sum, Sargeant and Johnson found that Plaintiff's allegations of non-sexual harassment and race and gender discrimination were "not substantiated," but did find that "a culture of fear

13

and retaliation exists with the three female members of Marci Banker's team." Specifically, Sargeant and Johnson noted that Banker made statements to her female subordinates to the effect that "she did not like working with women" and Banker's female subordinates "were afraid to speak to anyone in Petcare HR as well as [Banker's] manager Steve Giovanni for fear that word would get back to [Banker] and they would end up on a performance improvement plan or without a job." Sargeant and Johnson further noted that the women on Banker's team described her management style as "condescending," "abrasive," and "creating and fostering a hostile work environment," and that they "try to keep their distance from her" due to "a fear of retaliation, fear of losing their job and of not getting promoted." Sargeant and Johnson determined that Plaintiff's complaint that Banker treated one particular male VAM, Mike Scovronski, more favorably than others was "substantiated." Sargeant and Johnson also noted that one particular employee told them that she was told by Banker and Giovanni that it was "not a good idea" to complain about Banker to human resources, causing that employee to "put her tail between her legs and move on." In the "recommendations" section of their report, Sargeant and Johnson "strongly recommend moving [Banker] to a role where she is no longer managing others" and issuing her a "[s]trong formal warning regarding . . . no retaliation, treat all employees with respect, etc." Sargeant Dep. at Ex. 9.

14

P&G took remedial actions against Banker in response to the investigation of Sargeant and Johnson:

> [Erwin] and I [Walsh] went and met with [Banker] and we pulled her from managing anyone on her team for 60 days. We required Steve Giovanni to sit in on all her monthly one-on-ones. We required [Banker] to go to a leadership conference, and we removed [Plaintiff] from reporting directly to [Banker].

Walsh Dep. at 55. Meanwhile, on May 16, 2012, Plaintiff sent an email to Sargeant expressing her satisfaction with Giovanni, her new direct manager, writing that "his support and dedication to my success has been exceedingly apparent" and that working with him has been a "very professional experience." Taney Decl. Ex. A.

On June 1, 2012, Giovanni and Taney met with Plaintiff, and Giovanni recapped the meeting in an email to Plaintiff sent on June 7, 2012. During the meeting, the three discussed the results of Plaintiff's Alertline complaint, Plaintiff's job performance, and upcoming sales goals. Regarding the first issue, Giovanni acknowledged the results of the investigation, noting that "the investigation did reveal the feelings of fear and retaliation amongst . . . members of the team," and reassured Plaintiff that this was "being fixed." In addition, Giovanni invited Plaintiff to alert him, Erwin, or Taney should Plaintiff experience any retaliation going forward, writing that P&G would "not tolerate any form of

15

retaliation," and told Plaintiff to "share any more negative experiences" with him "at anytime." Taney Dep. Ex. 10.

During the June 1 meeting, the three also discussed Plaintiff's performance up until that point in fiscal year 2011-2012 and her selling plan for the next fiscal year. Giovanni noted that Plaintiff was "on target to achieve . . . 4 out of 6 deliverables [performance goals]" and that she "had a chance to make [her] 5th deliverable." The three also discussed steps for "getting off to a great start" in the next fiscal year, including "20-25 in clinic calls per week" and "[r]ecording [those] calls daily in salesforce.com." *Id.*

On June 14, 2012, Giovanni emailed Plaintiff inquiring whether Plaintiff had made her hotel reservations for a national sales conference scheduled for the next month. Pl. Ex. 17. Plaintiff responded informing Giovanni that she would be unable to attend the conference because her doctor had placed her on a travel restriction. *Id.* The travel restriction, signed by Plaintiff's doctor on June 14, 2012, indicated that Plaintiff is pregnant with an expected delivery date of November 1, 2012, and that "related to pregnancy she should not be traveling." Erwin Decl. Ex. C. On June 17, 2012, Lisa Breedon, a registered nurse in P&G's health services department, emailed Plaintiff congratulating her on her pregnancy and asking Plaintiff to provide more detailed information about her travel restrictions, noting that "[i]t is imperative that you remain safe at work." Breedon

16

Decl. ¶¶ 2-3, Ex. A.  On June 27, 2012, Plaintiff's doctor provided more details on

Plaintiff's medical restrictions, as requested by P&G:

> Due to her high risk pregnancy, we recommend the following
> restrictions.  At this point in her pregnancy, we recommend her not
> flying or taking a train.  Driving is permissible, 3-4 hours with a break
> every hour.  We recommend that she stay close to home.  She is able
> to work from home or the office at this time but, as the pregnancy
> progresses; we would prefer that she work from home.  We also
> recommend that she not lift anything over 25 pounds and maintain a
> low stress environment.

*Id.*

On July 25, 2012, Giovanni spoke to Plaintiff about her travel restrictions

and sent her an email the same day recapping the conversation.  Giovanni told

Plaintiff:

> [P]lease do not conduct any overnight travel in your territory until
> your doctor has had the opportunity to review your travel restrictions
> and approve overnight travel with Health Services.  In the meantime,
> please plan to continue working locally focusing on calling on 5-6
> clinics in person per day and be sure to stay within your
> medical/travel restrictions that are in place today.  Lastly, as a
> reminder, please be sure to log your calls into Salesforce.com daily.

Giovanni Decl. Ex. B.  On July 24, 2012, Erwin sent an email to Plaintiff and

Giovanni detailing the FMLA process and providing Plaintiff with the necessary

paperwork.  Erwin Decl. Ex. D.

On July 30, 2012, Giovanni sent an email to Tommy Walsh outlining six

issues with Plaintiff's performance.  The issues relate to Plaintiff's failure to

adhere to various deadlines regarding the submission of medical paperwork,

including FMLA-related papers, along with Plaintiff's failure to respond in a timely manner to work emails. In closing, Giovanni told Walsh that there have been "multiple examples of not following direction," including "15 days out [of] the field (as reported in salesforce.com as of July 9th)." Giovanni also wrote that Plaintiff "struggles with taking direction from just about anyone and it just does not seem like there is a willingness on her part to operate with discipline or a sense of urgency and take accountability of her actions." Pl. Ex. 13I.

On August 15, 2012, Plaintiff's doctor submitted another medical restriction: "Patient may only work from home starting 8/14/12 through the duration of her maternity leave." Pl. Dep. Ex. 22. However, P&G could not accommodate Plaintiff's work-from-home restriction. On August 17, 2012, Giovanni and Taney spoke to Plaintiff regarding the new restriction, and the details of the discussion are summarized in an email written by Giovanni to Plaintiff on August 20, 2012. Giovanni told Plaintiff to "suspend any and all field activity immediately" because her "health is very important to [P&G] and we want to ensure you follow all required restrictions." Giovanni also informed Plaintiff that P&G could not accommodate her new restriction prohibiting all field work:

> Since our field-based selling roles require face to face interaction, we are not able to accommodate your work-from-home restrictions. In addition, we have no available alternate and meaningful work for you to perform at home. Therefore, and has been consistent practice for field-based sales personnel requiring work-from-home accommodation, you will be placed on an unpaid leave of absence

18

> effective August 27th, 2012.  Your absences while on leave will be applied against your 12-week leave entitlement under the Family Medical Leave Act.

However, Giovanni also told Plaintiff that P&G could give her five months of unpaid leave, which is two months longer than required under the FMLA:

> Our practice in the selling organization is to allow employees to take four months for any medical-related leave [of] absence.  We follow this practice to prevent any adverse effect on volume in our business as a result of having a salesperson absent from his/her territory for an extended period of time.  On 08/17/12, you said that you would need three months post your surgery (which is now anticipated to occur in early October 2012) to recover.  Although this would take you from your territory for approximately 5 months, at this time we anticipate being able to effectively manage your territory during your period of absence.  If, however, the timing of your leave would extend greatly beyond this time, we may need to bring someone else into the territory to ensure we don't lose a significant amount of business with your customers.  We would of course, come to you first to see if you were ready to return before backfilling your role.

Pl. Dep. at Ex. 23.

Plaintiff testified that Taney tried to "force" her to take early FMLA leave during the August 17 discussion and when Plaintiff resisted, Taney stated, "oh, is it because you don't have the money?"  Pl. Dep. at 181.  Moreover, according to Plaintiff, Giovanni and Taney repeatedly asked her throughout her pregnancy – "I want to say four or five times" – to provide additional details regarding her work limitations beyond those provided by Plaintiff's doctor.  *Id.* at 199.

Plaintiff filed another Alertline complaint, alleging that "she was discriminated against because she was not allowed to work from home and because

she was being 'forced' to take FMLA." Taney Decl. ¶ 6. P&G assigned an independent investigator to investigate the complaint, and the investigator ultimately concluded that Plaintiff's allegations "could not be substantiated and that Plaintiff 'was told both verbally and in writing that she could have 3 months after her babies were born until she would be expected to be back to work and a position would be held for her.'" *Id.*

On August 22, 2012, Plaintiff's doctor eased Plaintiff's work restrictions: "Working from home is preferred at this point in her pregnancy, however she is not prohibited to go into the work field and may resume her normal work duties with no restrictions." Pl. Ex. 17. P&G returned Plaintiff to her normal job duties at this point. Pl. Dep. at 216; Giovanni Decl. ¶ 14.

In her affidavit, Plaintiff attests that she requested two weeks of vacation immediately prior to her maternity leave, which was scheduled to begin on October 3, 2012, but that Giovanni denied the request and instructed her to work from home during those two weeks. Pl. Aff. ¶ 9. However, the record indicates that Giovanni allowed Plaintiff to take vacation time prior to her leave. In an email sent to Plaintiff on September 28, 2012, Giovanni instructed Plaintiff to use eleven days of vacation from October 3, 2012 through October 18, 2012, and then to begin her FMLA leave on October 19, 2012. Pl. Ex. 13.

20

P&G deemed Plaintiff's work performance for fiscal year 2011-2012, covering July 1, 2011 to June 30, 2012, to be poor. Plaintiff made the lowest number of in-person sales calls of any VAM in the country. Giovanni Decl. ¶ 17. Of the VAMs that Giovanni supervised, Roger Cain made the most in-person calls (979) and Plaintiff made the least (274). *Id.* ¶ 18. Stu Miller, who made the second lowest number of in-person calls after Plaintiff, made 700 calls, which is more than double the number made by Plaintiff. *Id.* In light of this, Plaintiff was assessed a three rating for her performance in fiscal year 2011-2012, along with a VAM Scorecard ranking of 38 out of 41. A three rating meant that Plaintiff's performance was deemed in the bottom 6% relative to her peers. Erwin Decl. ¶ 9. Giovanni recommended the three rating to Walsh, who agreed with it because there was "[t]ime out in the field that we could not account for and poor performance on the scorecard." Walsh Dep. at 129. Giovanni attested that he recommended a three rating for Plaintiff "based on her poor work performance during the fiscal year" and stated that the recommendation "had nothing whatsoever to do with her race, gender, pregnancy, use of leave, or any other factor." Giovanni Decl. ¶ 22. Giovanni did not receive any input from Banker regarding Plaintiff's ranking. *Id.*

Plaintiff returned from her maternity leave on January 4, 2013. Giovanni Decl. ¶ 23. During the first three weeks following her return, Giovanni permitted Plaintiff to work from home "to catch-up on administrative items, learn about new

initiatives and ease back into her field sales role." *Id.* According to Plaintiff, Giovanni and Taney refused to authorize reimbursement for Plaintiff's home Internet and fax line. Pl. Dep. at 163-64. Plaintiff testified that Taney "laughed and joked" during a phone conversation with Plaintiff, "basically saying that he wanted to make sure that I wasn't stealing company funds to pay for [the] Internet. . . . [and] . . . that they wanted me to provide proof and documentation of what my bill was." *Id.* at 164-65.

On January 15, 2013, Giovanni sent Plaintiff an email summarizing a discussion the two had the day before. Giovanni Decl. Ex. D. In the email, Giovanni instructed Plaintiff to "build plans to travel and make in person calls to your accounts in Western and Northern Michigan a minimum of 3 times between now and the end of June" and to "begin making in person calls in the field starting . . . January 22." *Id.* Regarding the requirement that Plaintiff begin making in-person calls on January 22, Giovanni instructed Plaintiff to "complete a minimum of 5 in person calls per day" and to "record you[r] calls in salesforce.com daily." *Id.* Although Giovanni attested that Plaintiff recorded only one day in the field between January 22 and January 29, *id.* ¶ 25, the record also reflects that Plaintiff attended a five-day conference at Giovanni's direction during the third week of January. Pl. Aff. ¶ 10.

22

On February 5, 2013, Giovanni and Taney traveled to Detroit to meet with Plaintiff in person. Giovanni Decl. ¶ 26; Taney Decl. ¶ 10. Giovanni opened by sharing the objectives of the meeting and informing Plaintiff that she had received a three rating for fiscal year 2011-2012. Taney Dep. Ex. 14. The objectives of the meeting were to inform Plaintiff of her performance rating for fiscal year 2011-2012 and to present Plaintiff with a PIP to "provide [her] with honest and open feedback on performance issues holding her back from being competitive with her peers and with a plan to help resolve these issues." Plaintiff announced that she would record the meeting, but Taney told Plaintiff that she did not have P&G's permission to do so. Plaintiff "then decided to pack up and leave," at which time Taney told her that "this is an official meeting to discuss her performance which needs to be improved, and by walking out and not having the conversation, this could lead towards termination." Plaintiff announced that she was going to call her attorney and stepped out in the lobby to do so. *Id.*

Plaintiff returned about an hour later, "sat down, put the recorder on the table and just looked at [Giovanni and Taney]." Plaintiff told Giovanni and Taney that the recorder was off and the meeting began. *Id.* The recorder was not, in fact, off. Giovanni Decl. ¶ 32 ("I later learned that [Plaintiff] had not turned off the recorder and actually continued to tape record the meeting.").

According to Taney, the following then ensued:

[Giovanni] started again by explaining the rationale for the three rating. [Plaintiff] was a bit confused since she felt like the results in the recent months were equal to her peers. [Giovanni] explained that the timing for her rating was from July 2011 through June 2012 and that she had performance issues all year long. He shared several emails and letters asking [Plaintiff] to enter her calls into the sales data system. [Plaintiff] stated that this was only shared in the July sales meeting, July 2012, but [Giovanni] reminded her of these emails and several requests that were directly made to her to enter her data. With the data she entered, [Plaintiff] made an average of 1 call per day for the calendar year (only including the days that she worked). The requirement is 5-6 face to face calls per day.

[Giovanni] then moved from sharing her rating to sharing the [PIP]. [Plaintiff] immediately said that this plan is not doable and she would not sign it. [Giovanni] stated let's go through the details [of the PIP] line by line and we can discuss each point, which he did. [Plaintiff] had complaints about each section. I reminded [Plaintiff] that this plan is being put in place to help improve her performance. . . . I told her the sales objectives are somewhat negotiable but that [Giovanni] and she would need to dialogue about them. However, [Giovanni] as manager, who has responsibility for the business results, has the final say.

[Plaintiff] then discussed that calling on the 95 customers in Northern and Western Michigan was impossible and the wrong thing for the business. [Giovanni] shared that these customers were just as important as the ones that are close to her house. We are losing with these customers and since they have not been called on for a long time, it's critical we call on them immediately. He also said that it's all right to spread this out over two months, so that she wasn't traveling as much with the newborns.

[Plaintiff] still disagreed and said the best thing for the territory is to not call on these territories. [Giovanni], again disagreed, and told her that she needs to call on all of the key accounts within her territory. She again disagreed. I shared with [Plaintiff] that [Giovanni's] experience and responsibility as the manager is to ensure we are growing the business and that this was his call. [Plaintiff] stated that

24

she is not signing the document and not agreeing to calling on these customers.

[Giovanni] tried several times to explain the importance of calling on these customers and entering all sales data into the system. [Plaintiff] was not willing to neither discuss nor listen any longer. I told [Plaintiff] that if she is unwilling to perform the tasks of the job, she would be terminated. She then said, just fire me. I repeated that if you are willing [sic] to do these tasks, you leave us no choice. She then got up to leave. I asked for her to leave all company assets, like her laptop, American Express Card and keys to her car. I told her we would pay for a taxi to get her home. She stormed out stating, you will have to call the cops to get these from me.

Taney Dep. Ex. 14. Giovanni's recollection of the meeting is consistent with that of Taney. Giovanni Decl. ¶¶ 28-34, 38.

Giovanni attested that the decision to put Plaintiff on a PIP "had nothing whatsoever to do with [Plaintiff's] race, gender, pregnancy, use of leave, or internal complaints," and that the termination decision stemmed from Plaintiff's "poor performance and refusal to participate in the PIP." *Id.* ¶¶ 27, 28. Giovanni and Taney attested that they had no intention of terminating Plaintiff going into the February 5 meeting. Giovanni Decl. ¶ 28; Taney Decl. ¶ 10. Giovanni also attested that he is not aware of any P&G employee, other than Plaintiff, "who flatly refused to participate in a PIP or who disregarded Procter & Gamble's warnings as to the consequences of not participating in a PIP." Giovanni Decl. ¶ 35.

Giovanni attested that the goals set forth in Plaintiff's PIP were attainable and reflected the minimum expectations of Plaintiff's job:

> The objectives set forth in [Plaintiff's] PIP reflected the minimum
> day-to-day expectations for a VAM and approximated 1/12 of
> [Plaintiff's] annual expectations – in line with the 30-day duration of
> the PIP.  The goals in the PIP . . . reflected the minimum expectations
> for a VAM and were accomplishable within the 30-day timeframe.

Giovanni Decl. ¶ 29.   However, Plaintiff testified that the PIP was "very harassing," "inaccurate," and "[a] set up for me to fail."  Pl. Dep. at 173-75. Plaintiff points out multiple aspects of the PIP, each of which she contends was unattainable or contrary to P&G policy.  Pl. Dep. at 166-67, 170-76.

Plaintiff filed this lawsuit on August 6, 2013.   Her amended complaint contains the following five counts:

> Count I: Sex and pregnancy discrimination under Title VII;
> Count II: Sex and pregnancy discrimination under ELCRA;
> Count III: Interference and retaliation under the FMLA;
> Count IV: Race discrimination under Title VII and ELCRA;
> Count V: Retaliation in violation of Title VII and ELCRA.

After the close of discovery, P&G filed the present motion for summary judgment.

### III.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   The relevant inquiry "is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).

## IV.  ANALYSIS

Plaintiff alleges that she was discriminated against, based on her race and pregnancy, in violation of Title VII and Michigan's ELCRA, and that she was terminated because she complained about discrimination and took FMLA leave. P&G seeks summary judgment with regard to each of Plaintiff's claims.

### A.  Race and Pregnancy Discrimination Under Title VII and ELCRA

### 1.  General Framework for Discrimination Claims

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Michigan law includes a similar protection.  Mich. Comp. Laws § 37.2202(a).  Discrimination claims under Title VII and ELCRA are analyzed under the same evidentiary framework. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 n.2 (6th Cir. 2010).  Under both federal and Michigan law, discrimination on the basis of "sex" includes pregnancy.  42 U.S.C. § 2000e(k); Mich. Comp. Laws § 37.2201(d).

Plaintiff may prove her discrimination claims by either direct or indirect (circumstantial) evidence. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). Here, Plaintiff relies solely on circumstantial evidence in support of her discrimination claims, and must therefore employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Under the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie case of discrimination. If Plaintiff is able to do so, the burden shifts to P&G to offer a legitimate, non-discriminatory explanation for its actions. If P&G produces such an explanation, Plaintiff must offer evidence on which a reasonably jury could rely to reject P&G's proffered explanation. *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013).

## 2. Prima Facie Case

To establish a prima facie case of discrimination, Plaintiff must establish the following four elements: (1) She is a member of a protected class; (2) She was qualified for the job and performed it satisfactorily; (3) Despite her qualifications and performance, she suffered an adverse employment action; and (4) She was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of her protected class. *Laster*, 746 F.3d at

727.  The Court assumes for the present purposes that Plaintiff has satisfied all four elements of her prima facie case.

### 3.  Legitimate, Non-Discriminatory Reason for Termination

P&G contends that Plaintiff was placed on a PIP solely because of her poor performance, and subsequently terminated because she failed to participate in the PIP.  The record contains adequate evidence supporting the position that these legitimate, non-discriminatory reasons served as the sole basis for Plaintiff's termination. *See, e.g.*, Giovanni Decl. ¶¶ 27, 38.  Therefore, P&G has satisfied its burden of presenting an appropriate basis for its decision to place Plaintiff on a PIP and subsequently terminate her.

### 4.  Pretext

Because P&G offered a legitimate, nondiscriminatory reason for the adverse employment action it took against Plaintiff, the burden shifts back to Plaintiff to prove that P&G's asserted reason is pretextual.  At this stage, Plaintiff has the burden to produce sufficient evidence from which a jury could reasonably reject P&G's explanation of why it terminated her.  She can accomplish this by proving (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate her discharge, or (3) that the proffered reasons were insufficient to motivate discharge. *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 285 (6th Cir. 2012).

Plaintiff first argues that her poor performance did not motivate the PIP and termination because P&G did not take similar action against other subpar VAMs with similar performance issues.  In other words, Plaintiff points out that similar records of poor performance should have resulted in similar remediation efforts by P&G, and the fact that P&G did not place comparable employees on PIPs and terminate them suggests that P&G did not view Plaintiff's performance as sufficiently problematic to warrant a PIP and termination, which in turn suggests that some reason other than poor performance must have motivated the adverse actions P&G took against Plaintiff.

The Court rejects this argument because Plaintiff has failed to name a similarly situated VAM who was treated more favorably.  Plaintiff argues that she should be compared to three particular VAMs: Stephanie Campbell, Debra Kerley, and Michael Glidewell, all of whom Plaintiff argues were not pregnant and non-minorities who experienced performance issues similar to those of Plaintiff yet were treated more favorably than was Plaintiff.  However, the record reflects that Plaintiff's workplace performance was significantly weaker than the workplace performances of Campbell, Kerley, and Glidewell, and, unlike Plaintiff, Campbell, Kerley, and Glidewell were not uncooperative with a PIP.

The following chart compares Plaintiff's performance statistics with the performance statistics of Campbell, Kerley, and Glidewell over the 2010-2011 and 2011-2012 fiscal years.

| VAM | Fiscal Year 2010-2011 | | Fiscal Year 2011-2012 | | Supervisor |
|---|---|---|---|---|---|
| | Scorecard Ranking | In-Person Sales Calls | Scorecard Ranking | In-Person Sales Calls | |
| Plaintiff | 34 of 38 | 270 | 38 of 42 | 274 | Banker/Giovanni |
| Stephanie Campbell | 38 of 38 | 741 | 36 of 42 | 797 | Giovanni |
| Debra Kerley | 21 of 38 | 1065 | 32 of 42 | 848 | Giovanni |
| Michael Glidewell | 25 of 38 | 998 | 41 of 42 | 453 | Neither Banker nor Giovanni |

Giovanni Decl. ¶¶ 6, 15, 18, Ex. C. Construing the performance data in the light most favorable to Plaintiff, no reasonable jury could conclude that Plaintiff was similarly situated to Campbell, Kerley, or Glidewell. Although some aspects of Plaintiff's performance statistics are similar to those of the urged comparators, the significant difference between the number of in-person sales calls logged by Plaintiff, on the one hand, and her purported comparators, on the other hand, alone compels the Court to conclude that Campbell, Kerley, and Glidewell are not similarly situated individuals. Campbell, Kerley, and Glidewell each logged significantly more in-person calls than did Plaintiff in two consecutive fiscal years. For fiscal year 2010-2011, Plaintiff logged only 270 in-person sales calls, compared to 741, 1065, and 998 logged calls by Campbell, Kerley, and Glidewell, respectively, and the disparity is nearly as distinct for fiscal year 2011-2012, with

31

Plaintiff logging only 274 in-person sales calls, compared to 797, 848, and 453 in-person calls logged by Campbell, Kerley, and Glidewell, respectively.

Moreover, Plaintiff has not presented evidence that the three comparators engaged in similar conduct when confronted with a PIP. The evidence indicates that Plaintiff attempted to tape record and then walked out of a meeting with her supervisors after learning that the purpose of the meeting was to discuss her prior performance and ways to improve going forward. When Plaintiff returned and was presented with a PIP, Plaintiff complained about each aspect of it and expressed disagreement with Giovanni's business approach to Michigan's northern and western territories, believing that her approach should be followed over Giovanni's.[3] The record reflects that Giovanni attempted to reason with Plaintiff and explain the rationale behind his approach, but Plaintiff persisted in her belief that her way was better and told Giovanni and Taney that she refused to visit P&G's customers in the northern and western regions. Giovanni also conveyed that the requirements set forth in the PIP were flexible. Specifically, Giovanni and Taney were open to extending the PIP beyond 30 days and negotiating the sales goals required under the PIP. Yet, Plaintiff refused to discuss the PIP further or

---

[3] This was not the first time Plaintiff expressed disagreement with her management about this issue. During the March 2, 2012 teleconference between Plaintiff, Erwin, and Banker, Plaintiff balked about Banker's approach to Michigan's western territory, taking the position that the territory should not be emphasized because the majority of business was located in Michigan's southwest region, and Michigan's western region comprised "white space."

"listen any longer." Plaintiff has not attempted to present evidence showing that another VAM was allowed to keep his or her job in light of similar instances of insubordination, including an unwillingness to follow a business plan outlined by a supervisor. In other words, Plaintiff has presented no evidence rebutting Giovanni's attestation that he is "not aware of any employee [other than Plaintiff] who flatly refused to participate in a PIP or who disregarded Procter & Gamble's warnings as to the consequences of not participating in a PIP." Therefore, the Court rejects Plaintiff's argument that her poor performance was a pretext for discrimination based on the theory that other VAMs with similar performance issues were not placed on PIPs and terminated.

Relatedly, Plaintiff argues that her performance was adjudged by subjective, rather than objective, standards, which should trigger "particularly close scrutiny" of P&G's decision to take adverse action against Plaintiff. *See Bruhwiler v. Univ. of Tenn.*, 859 F.2d 419, 421 (6th Cir. 1988) (employment decision is subject to "particularly close scrutiny" when it was subjective and decision makers were not members of minority group). However, P&G's decision to place Plaintiff on a PIP and ultimately terminate her resulted from both objective assessments of Plaintiff's performance (e.g., VAM Scorecard rankings and the number of in-person sales calls made) and subjective assessments of Plaintiff's performance (e.g., Plaintiff's conduct during the February 5, 2013 meeting).

Plaintiff also argues that P&G's asserted reason for placing her on a PIP, poor performance, is a sham because Plaintiff's PIP was a "set up to fail." Plaintiff argues that the PIP included unattainable goals, goals that are inconsistent with P&G's policies, and required Plaintiff to perform tasks that went beyond her job duties. These arguments are unpersuasive.

Plaintiff first asserts that the PIP "required [her] to be on the road, away from the bulk of her business in southeast Michigan, for 30 consecutive days," and that this was "inconstant with P&G's own selling strategy and business plans." Pl. Resp. at 27-28. Plaintiff mischaracterizes the record. In fact, the PIP required Plaintiff to "be in the field Monday through Friday and complete a minimum of . . . 5-6 in person calls per day," and to "make one in person call to all purchasing clinics in Western and Northern Michigan." Pl. Ex. 12. Nothing in these requirements suggests that Plaintiff was required to be "on the road . . . for 30 consecutive days"; rather, she was required to work only Monday through Friday. Moreover, the fact that the PIP required Plaintiff to be "away from the bulk of her business in southeast Michigan" during the 30-day PIP period is not suspect and not surprising because, as discussed, Plaintiff's region covered northern and western Michigan and the evidence indicates that P&G viewed those areas as important but neglected by Plaintiff.

34

Plaintiff objects to the number of in-person calls that she was required to make during the 30-day PIP period (5-6 per day), arguing that this requirement of the PIP is "suspect." However, the record does not support Plaintiff's view. There was nothing new about the requirement in the PIP that Plaintiff make 5-6 in-person sales calls per day (i.e., 20-25 per week and 100-120 per month). Giovanni told Plaintiff during their June 1, 2012 conference that the goal should be 20-25 in-clinic calls per week, and Giovanni again emphasized this requirement to Plaintiff on July 25, 2012, and then once again on January 14, 2013. The undisputed evidence reveals that this was part of Plaintiff's job, a fact that Plaintiff admitted in her deposition. Pl. Dep. at 172 (answering "[y]es" to the question, "five to six in person calls per day is the standard for all VAM's, isn't it?").

Plaintiff also complains that the duration of the PIP – 30 days – was unusually short. However, Taney testified that PIPs are "typically 30, 60 or 90 days," Taney Dep. at 34, and the PIP itself contains an explanation for the 30-day duration. Pl. Ex. 12 ("We have elected a 30 day PIP in lieu of longer time period, because the goals and actions required in this PIP are the minimum day-to-day expectations for all Band 1 Veterinary Account Managers and therefore, we see no obstacle to [Plaintiff] being able to successfully meet the action steps of the PIP in a 30 day timeframe."). In addition, during the February 5, 2013 meeting between Plaintiff, Giovanni, and Taney, Giovanni offered to afford Plaintiff more time

beyond 30 days to complete one of the main requirements of the PIP – visiting clinics in Michigan's northern and western regions.

For all these reasons, Plaintiff has not impugned P&G's legitimate, nondiscriminatory reason for placing her on a PIP by showing that the PIP was a "set up to fail."

Plaintiff next argues that P&G refused to recognize three ways in which it hindered Plaintiff's ability to make in-person sales calls in the 2011-2012 fiscal year, yet unfairly used Plaintiff's lack of in-person calls against her to justify the decision to place Plaintiff on a PIP.  According to Plaintiff, P&G hindered her ability to make in-person sales calls by: (1) requiring her to attend three conferences that took her out of the field in July 2011, thus interfering with her ability to make in-person calls in that month; (2) telling her not to record all of her sales activity from October 2011 to February 2012; and (3) prohibiting her from traveling from June to September 2012.  Plaintiff contends that P&G's failure to recognize these three restraints – all of which were imposed by P&G – suggests that one of its asserted legitimate reasons for placing Plaintiff on a PIP – a lack of in-person sales calls – did not actually motivate the decision.  The Court rejects this argument.

Regarding the first restraint, the Court notes that Plaintiff's in-person call numbers were evaluated relative to other VAMs.  Therefore, Plaintiff's attendance

at conferences would only adversely affect her performance ratings to the extent that other VAMs were also not required to attend similar events that took them out of the field. Plaintiff has produced no evidence showing the extent to which other VAMs engaged in work activities that took them out of the field.

Moreover, Plaintiff's attestation that Banker told her not to log all of her sales activity from October 2011 to February 2012, made in an affidavit submitted in connection with these summary judgment proceedings, was oddly not mentioned by Plaintiff when she was asked in her deposition why she did not follow Banker's written instruction to "LOG EVERYTHING IN SALESFORCE" during fiscal year 2011-2012:

> Q: So July 2011 to February 2012, you reported to [Banker], correct?
>
> A: Yes.
>
> Q: And she wrote an e-mail as we have went through several times, to your team, saying, log everything in Salesforce. Do you remember that? . . .
>
> A: Yes.
>
> Q: But your testimony is you didn't comply with that, correct?
>
> A: Correct.
>
> Q: And why is that?
>
> A: I just didn't.

37

Pl. Dep. at 128.  Had Banker really told Plaintiff not to log all of her activity in Salesforce.com, as Plaintiff attested in paragraph three of her affidavit, Plaintiff had the perfect opportunity to say so, instead of her answer, "I just didn't." Although this does not amount to a direct contradiction between the affidavit and deposition testimony, as P&G urges, the Court is inclined to conclude, based on the factors set forth in *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) and adopted by the Sixth Circuit in *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908-09 (6th Cir. 2006), that paragraph three of the affidavit "constitutes an attempt to create a sham fact issue" such that it may be disregarded by the Court in these summary judgment proceedings.[4]

In any event, even if the Court credited Plaintiff's attestation that Banker instructed her not to log all of her sales activity in Salesforce.com from October 2011 to February 2012, the Court, construing the facts in the light most favorable

---

[4] In *Aerel*, the Sixth Circuit adopted the test set forth in *Franks* for determining whether a post-deposition affidavit "constitutes an attempt to create a sham fact issue" and thus may be disregarded:

> Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

*Franks*, 796 F.2d at 1237.  The three non-exhaustive *Frank* factors weigh in favor of the conclusion that paragraph three of Plaintiff's post-deposition affidavit amounts to an attempt to create a sham fact issue.

to Plaintiff, would still reject Plaintiff's argument that P&G's failure to acknowledge Banker's instruction undermines one of its reasons for implementing the PIP. As P&G points out, even excluding the time period during which Plaintiff was allegedly instructed not to log all of her sales activity, Plaintiff still made by far the lowest number of in-person sales calls during the 2011-2012 fiscal year. Giovanni attested that Plaintiff "had the lowest number of in-person calls of any of the VAMs I supervised" from March 1, 2012 to June 30, 2012. Giovanni Decl. ¶ 19. According to Giovanni: "During that time period, Roger Cain made 305 in-person calls, Deb Kerley made 282 in-person calls, Stephanie Campbell made 276 in-person calls, Stu Miller made 235 in-person calls, and [Plaintiff] made 136 in-person calls." *Id.* This unrebutted evidence demonstrates that P&G had ample reason to place Plaintiff on a PIP based on her call numbers in the 2010-2011 fiscal year, along with her call numbers in fiscal year 2011-2012, excluding the months Banker purportedly told Plaintiff not to record all of her sales activity.

Finally, Plaintiff's medical restrictions from June to September 2012 did not have any impact on her in-person call numbers for fiscal year 2010-2011, which ended before Plaintiff became pregnant, and did not have a substantial impact on her in-person call numbers for fiscal year 2011-2012. Notably, the 2011-2012 fiscal year ended on June 30, 2012 and Plaintiff's medical restrictions did not begin until mid-June 2012. Therefore, at most, Plaintiff's medical restrictions

affected her in-person call numbers for just two weeks out of the entire fiscal year, which is not a long enough time period to substantially impact the numbers, especially given how low Plaintiff's in-person call numbers were compared to the VAM with the next highest number. In any event, for most of the time during which Plaintiff was medically restricted prior to her maternity leave, the restrictions did not prevent Plaintiff from making the required number of daily in-person calls. In sum, construing the evidence in the light most favorable to Plaintiff, Plaintiff has not established that her medical restrictions had anything more than a de minimus impact, if that, on her in-person call numbers during either of the two fiscal years in question.

For these reasons, no reasonable jury could conclude that P&G unfairly evaluated Plaintiff's performance, calling into question P&G's legitimate, nondiscriminatory rationale for placing Plaintiff on a PIP, by failing to consider restrictions placed on her that purportedly stunted her in-person call numbers.

Finally, Plaintiff argues that there was a "corporate culture" of discrimination and retaliation at P&G, and that this workplace culture supports her argument that P&G's legitimate, nondiscriminatory reason for placing her on a PIP and ultimately terminating her is pretextual. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) ("Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's

workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff."). In support of her argument, Plaintiff contends that P&G "ignored and dismissed" her complaints of discrimination, focusing on how Erwin handled Plaintiff's complaints, essentially arguing that Erwin did not take them seriously. Plaintiff also discusses the manner in which her first Alertline complaint was handled and the actions (or inactions, according to Plaintiff) that P&G took afterwards. Finally, Plaintiff argues that P&G rewarded Banker for her conduct by giving her a raise and otherwise treating her favorably. However, for the following reasons, the record does not support Plaintiff's position that there was a corporate culture of discrimination and retaliation at P&G.

Plaintiff first complained to Klette of "verbal abuse and harassment" by Banker on February 7, 2012, stemming from the January 5, 2012 telephone call between Plaintiff and Banker. After Klette and Plaintiff spoke, Klette turned the matter over to Erwin, the appropriate human resources contact for Plaintiff's division. At this point, there is no evidence that Plaintiff alleged *racial* discrimination by Banker; rather, the gist of Plaintiff's complaint at the time was that Banker treated the women on her team worse than the men, and that Banker acted in an unprofessional manner during her January 5, 2012 phone conference with Plaintiff. After a conference on March 2, 2012 between Erwin, Plaintiff, and Banker during which Plaintiff's complaints about Banker were noted but not

addressed, Erwin initiated an investigation regarding Plaintiff's complaints, which began with a conversation on March 13, 2012 between Erwin and Plaintiff about Plaintiff's concerns with Banker.

While Plaintiff is quick to point out that Erwin was not sure at this point whether Plaintiff was asserting a discrimination complaint, the fact remains that Erwin did pursue an investigation of Plaintiff's complaints and sought additional information from Plaintiff.   Indeed, the next day, in an email recapping their conversation the day before, Erwin assured Plaintiff that she would be conducting an investigation into Plaintiff's complaints.   As part of that investigation, Erwin and Giovanni attempted to obtain further information from Plaintiff through follow-up questions to be asked in a conference between Plaintiff, Erwin, and Giovanni.   However, Plaintiff refused to discuss the matter with Erwin and Giovanni and declined to participate in the conference call, asserting for the first time a claim of "racial discrimination" and reiterating her prior claim of "harassment."   The next day, Plaintiff formalized her complaint through P&G's Alertline system, and P&G took two actions shortly thereafter: It appointed two investigators to conduct a formal investigation of Plaintiff's allegations, and it reassigned Plaintiff so that she would not have contact with the two individuals who were the subject of the complaint – Banker and Erwin.

42

Although Plaintiff argues that P&G did not take appropriate action against Banker in response to the findings of Sargeant and Johnson that "a culture of fear and retaliation exists with the three female members of Marci Banker's team," Plaintiff ignores the fact that Erwin and Walsh removed Banker from her managerial role for 60 days and required her to attend a leadership conference. Moreover, Plaintiff faults P&G for requiring her to report to Giovanni in light of Sargeant and Johnson's mention of an incident in which Giovanni told another employee that it was "not a good idea" to complain about Banker to human resources. However, Plaintiff was actually pleased to be working with Giovanni as of May 16, 2012, when Plaintiff emailed Sargeant writing that Giovanni's "support and dedication to my success has been exceedingly apparent" and that working with him has been "very professional experience." In any event, other than the report of Sargeant and Johnson, there is no admissible evidence that Giovanni told another employee not to complain to human resources about Banker and, even if there was such evidence, the fact remains that Giovanni assured Plaintiff during a discussion on June 1, 2012 that P&G would "not tolerate any form of retaliation" and invited Plaintiff to "share any more negative experiences" with him "at anytime."

Simply put, the record does not support Plaintiff's argument that P&G "ignored" or "dismissed" Plaintiff's complaints of discrimination. Rather, the

43

evidence shows that P&G promptly responded to Plaintiff's complaints, attempted to obtain more information from Plaintiff, was eager to assist Plaintiff in resolving her issues with Banker, conducted a formal investigation involving numerous employee interviews, and took remedial steps to correct the issues uncovered in the investigation.[5]   Accordingly, the Court concludes that no reasonable jury could find that a corporate culture of discrimination and retaliation existed at P&G, and Plaintiff therefore has not demonstrated pretext through this approach.

For these reasons, Plaintiff has not offered evidence on which a reasonable jury could rely to reach the conclusion that P&G's asserted reasons for the termination, performance issues and failure to comply with the PIP, are pretextual. Thus, the Court will grant summary judgment to P&G regarding Plaintiff's claims of race and pregnancy discrimination under Title VII and ELCRA.

## B.  Retaliation Claim Under Title VII and ELCRA

Title VII's anti-retaliation provision makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice

---

[5] Plaintiff makes much of the fact that Banker received a $5,000 raise near the end of 2012 and was treated favorably the next year in terms of her ability to change positions within P&G, arguing that P&G rewarded the conduct of an employee who was found to have acted inappropriately.  However, the specific circumstances of Banker's raise are unknown, except that Banker testified that she received it for "good" performance, and Plaintiff's belief that the raise served as a reward for bad behavior is speculative and unsupported by any evidence.

by this subchapter." 42 U.S.C. § 2000e-3(a). Michigan law contains a similar prohibition. *See* Mich. Comp. Laws. § 37.2701(a). Retaliation claims under ELCRA are analyzed using the same legal framework as Title VII retaliation claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013).

As Plaintiff has offered no direct evidence of retaliation, she must proceed using the *McDonnell Douglas* burden-shifting framework. Under this framework, Plaintiff has the initial burden to establish a prima facie case of retaliation, which consists of four elements: (1) Plaintiff engaged in activity protected under Title VII; (2) Plaintiff's exercise of her protected rights was known to P&G; (3) an adverse employment action was subsequently taken against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. If Plaintiff establishes the elements of her prima facie case, the burden of production shifts to P&G to rebut the presumption by articulating a legitimate, nondiscriminatory reason for its action. If P&G successfully produces such a legitimate reason, then the burden of production returns to Plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination. *Id.* at 674-75.

P&G argues that Plaintiff's retaliation claims fail because she cannot demonstrate a genuine issue of material fact with regard to the fourth element of her prima facie case (causation) and pretext. For the reasons discussed above,

45

Plaintiff has failed to come forward with evidence that would allow a reasonable jury to find that the legitimate, non-discriminatory reasons asserted by P&G for placing Plaintiff on a PIP and terminating her were a pretext for discrimination. Therefore, Plaintiff's retaliation claims fail for this reason alone.

Even had Plaintiff demonstrated a fact issue with regard to pretext, her retaliation claims would still fail because, as P&G correctly argues, Plaintiff has not demonstrated a fact issue with regard to the fourth element of her prima facie case, requiring her to show a causal connection between her protected activity and the adverse employment actions taken by P&G. To do so, Plaintiff must show that P&G's "desire to retaliate was the but-for cause of the challenged employment action." *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

P&G concedes that Plaintiff's first Alertline complaint, filed on March 15, 2012, constitutes protected activity, and that Plaintiff's placement on a PIP, which occurred on February 5, 2013, constitutes an adverse employment action for purposes of Plaintiff's retaliation claims. Plaintiff does not dispute the timing of her protected activity relative to the adverse employment action. Because nearly eleven months elapsed between Plaintiff's protected activity and an adverse employment action, Plaintiff does not, and could not, rely on the temporal proximity of the two events in support of her causation argument. *See, e.g.*, *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) ("loose temporal proximity"

46

of "two to five months" between protected activity and adverse employment action deemed "insufficient to create a triable issue").

Instead, Plaintiff relies on other factors to support causation. Plaintiff claims that issues with her performance were first brought to her attention soon after she first complained to Klette about Banker's behavior – timing that Plaintiff believes is suspect and demonstrates P&G's retaliatory mindset. However, Plaintiff is wrong on the timing. In fact, performance issues were first brought to Plaintiff's attention on August 23, 2011, well *before* Plaintiff first complained about discrimination, harassment, or retaliation. On August 23, 2011, Banker sent an email to Plaintiff indicating that she "can't understand how you [Plaintiff] are logging things [in Salesforce.com]" and reminding Plaintiff that "[y]ou should have more in person calls than phone calls." Plaintiff did not first complain about discrimination or harassment until February 7, 2012, when she emailed Klette asking if the two could discuss "a private matter."

The remaining arguments asserted by Plaintiff in support of the causation element of her prima facie case are duplicative of the arguments asserted by Plaintiff in the section of her brief devoted to pretext. Those arguments have already been addressed and rejected by the Court.

Because Plaintiff has not demonstrated a triable issue with regard to the fourth element of her prima facie case or pretext, the Court will grant summary judgment to P&G on Plaintiff's retaliation claims under Title VII and ELCRA.

### C. Plaintiff's FMLA Claims

The FMLA permits qualifying employees to take twelve weeks of unpaid leave each year "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A). On return from FMLA leave, the employee is entitled to be restored to either "the position of employment held by the employee when the leave commenced" or "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1).

Two recovery theories are available under the FMLA: an interference/entitlement theory pursuant to 29 U.S.C. § 2615(a)(1), and a retaliation/discrimination theory pursuant to 29 U.S.C. § 2615(a)(2). *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Under the interference theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA – for example, a twelve-week leave or reinstatement after taking a medical leave." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (6th Cir. 1998). Conversely, retaliation claims under the FMLA "impose liability on employers that act against employees specifically

48

because those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

In her amended complaint, Plaintiff asserts both an interference claim and a retaliation claim under the FMLA. However, P&G notes in its summary judgment motion that Plaintiff does not allege any facts supporting her interference claim and, in her response brief, Plaintiff does not dispute this observation or otherwise mention an FMLA interference claim. Therefore, Plaintiff has abandoned the claim and the Court will dismiss it.

Plaintiff does, however, pursue her FMLA retaliation claim. Plaintiff claims that she was placed on a PIP and terminated because she took FMLA leave. The *McDonnell Douglas* burden-shifting framework applies to FMLA retaliation claims:

> To establish a claim of retaliation, a plaintiff must demonstrate that (1) she engaged in a protected activity, i.e. notifying the defendant of her intent to take leave under the FMLA; (2) she suffered an adverse employment action; and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. If a plaintiff's claim is based on circumstantial evidence, *McDonnell Douglas Corp. v. Green*'s burden-shifting analysis applies. The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for terminating the plaintiff. The plaintiff then has the burden of showing that the defendant's reasons are merely a pretext for discrimination.

*Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 408-09 (6th Cir. 2014) (quotation marks, brackets, and citations omitted).

49

In its summary judgment motion, P&G argues that Plaintiff cannot demonstrate a fact issue regarding the third element of her prima facie case – causation.  P&G also argues that Plaintiff cannot show that the legitimate reason offered by P&G in support of its termination decision is pretextual.  For reasons already discussed, Plaintiff has not demonstrated a fact issue with regard to pretext.  Thus, her FMLA retaliation claim fails for this reason alone.

In any event, even if Plaintiff satisfied her burden on pretext, her FMLA retaliation claim would still fail because Plaintiff cannot satisfy the fourth element of her prima facie case, which requires Plaintiff to show a causal connection between the exercise of her rights under the FMLA and her termination.   In arguing that P&G's termination decision resulted from Plaintiff's decision to take FMLA leave, Plaintiff points out that she was placed on a PIP and terminated on February 5, 2013, only a month after Plaintiff returned from her FMLA leave on January 4, 2013.  However, the Sixth Circuit has cautioned against "drawing an inference of causation from temporal proximity alone," *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010), unless the employer "retaliate[s] swiftly and immediately upon learning of protected activity," leaving the employee "unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Here, although Plaintiff's burden at the prima facie stage "is not intended to be an onerous one," *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 315 (6th Cir. 2001), the Court concludes that Plaintiff cannot rely on temporal proximity alone and must instead couple temporal proximity with other indicia of retaliatory animus to satisfy the causation element of her prima facie case.[6]

In addition to temporal proximity, Plaintiff offers several actions by P&G, all of which she contends are indicative of P&G's retaliatory motive. First, Plaintiff states that "Giovanni and Taney . . . repeatedly attempted to force [her] to take early FMLA leave without a guarantee that her job would be protected." Pl. Resp. at 34. However, the evidence reveals that P&G attempted to accommodate Plaintiff's medical situation by allowing her to take a total of two additional months of FMLA leave over and above the three months that the statute requires. In his August 20, 2012 email to Plaintiff, Giovanni told Plaintiff that P&G "anticipate[s] being able to effectively manage your territory during your period of absence." In asserting that P&G would not "guarantee that her job would be

---

[6] As stated, courts do not require other evidence of retaliatory animus in addition to temporal proximity in cases where little or no time elapses between the protected activity and adverse employment action because, otherwise, a plaintiff could never show causation, as there is insufficient time for an employee to glean additional evidence of retaliation. In the present case, while only one month elapsed between Plaintiff's return from FMLA leave and the adverse employment action, a lot happened in that month in terms of Plaintiff's interaction with her supervisors, leaving Plaintiff with ample opportunity to glean a retaliatory motive if one existed.

protected," Plaintiff may be relying on Giovanni's statement that P&G may have to "backfill[]" Plaintiff's role if "the timing of [her] leave would extend greatly beyond this time."   However, Giovanni was merely advising Plaintiff that P&G may have to replace her if she was on leave for longer than *five* months – two months longer than the FMLA requires – and Giovanni even told Plaintiff that P&G "would of course, come to you first to see if you were ready to return before backfilling your role."[7]   In sum, P&G was generous with Plaintiff by extending her greater protections than the statute requires.   *See Edgar*, 443 F.3d 501, 506-07 ("This court has . . . held that an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave.").

Second, Plaintiff argues that a retaliatory motive can be shown because P&G "demanded a list of all *possible* [medical] restrictions [and] told [Plaintiff] not to

---

[7] Plaintiff testified that Taney tried to "force" her to take early FMLA leave. Accepting this testimony as true, as the Court must, Plaintiff fails to explain how or why such pressure suggests an intent to retaliate against Plaintiff for taking leave.   Insofar as Plaintiff is claiming that P&G interfered with her rights under the FMLA by forcing her to take early FMLA, the claim fails as a matter of law because Plaintiff's medical restrictions prohibiting any work travel prevented her from performing the essential functions of her job, which required travel, and there was no subsequent, unsuccessful attempt to take FMLA leave.   S*ee Kleinser v. Bay Park Cmty. Hosp.*, 793 F. Supp. 2d 1039, 1045 (N.D. Ohio 2011) ("A plaintiff who is forced to enter continuous FMLA leave will have an actionable claim *only if* (1) the employee, when placed on involuntary leave, did not have a serious health condition that precluded her from working, and (2) the employee unsuccessfully seeks FMLA leave that has already been expended during an earlier, wrongful forced leave.").

travel or work." Pl. Resp. at 34 (emphasis in original). However, there is nothing to suggest that P&G harbored any retaliatory motive towards Plaintiff when it asked Plaintiff to provide additional details on her work restrictions and prohibited her from traveling and working. In fact, the evidence suggests that P&G requested further medical details of Plaintiff because it was genuinely concerned for Plaintiff's workplace safety, as P&G's documented requests for further details on Plaintiff's restrictions also contain statements of concern for Plaintiff's workplace safety. In mid-June 2012, Plaintiff submitted a doctor's note stating "that she should not be traveling." Because Plaintiff's position involved travel, Breedon reasonably asked for more detailed information about the travel restrictions contemplated by Plaintiff's doctor, writing that "[i]t is imperative that you remain safe at work." Plaintiff then submitted a more detailed doctor's note stating that Plaintiff should "stay close to home" and only travel by car "3-4 hours with a break every hour." In response to the new restriction, Giovanni reasonably told Plaintiff "not to conduct any overnight travel in your territory" and "to continue working locally focusing on calling on 5-6 clinics in person per day and be sure to stay within your medical/travel restrictions that are in place today." Then on August 15, 2012, Plaintiff's doctor submitted an additional work limitation preventing Plaintiff from doing any work travel "through the duration of her maternity leave." In response to this, Giovanni told Plaintiff that her "health is very important to us

and we want to ensure you follow all required restrictions," explaining to Plaintiff that P&G could not accommodate the new medical restriction and that Plaintiff would need to begin her FMLA leave, while also offering to afford Plaintiff two extra months of FMLA leave beyond the three months required by the statute. When Plaintiff's doctor subsequently eased Plaintiff's restrictions on August 22, 2012, permitting her to travel again, Plaintiff was allowed to return to her VAM duties.  There is simply nothing in this chronology of events on which a reasonable jury could rely to reach the conclusion that P&G was acting out against Plaintiff for taking FMLA leave.  Although Plaintiff testified that Giovanni and Taney asked her "four or five times" to provide additional details regarding her current and anticipated work limitations, there is nothing to indicate that they did so for any reason other than out of concern for Plaintiff's workplace safety.

Third, Plaintiff argues that P&G acted with a retaliatory animus when it "characterized her resistance to . . . early [FMLA] leave as performance deficiencies."  Pl. Resp. at 34.  Although Plaintiff does not expand on this argument, the Court believes that Plaintiff is referring to Giovanni's July 30, 2012 email to Walsh in which Giovanni notes various issues with Plaintiff's performance.  However, Plaintiff's performance was not deemed deficient because she was resistant to FMLA leave; Plaintiff's performance was deemed deficient

because Giovanni did not believe that she had followed P&G's instructions with regard to the submission of her medical paperwork.

Finally, Plaintiff argues that she was forced to "work from home instead of taking vacation" prior to her maternity leave. However, the evidence demonstrates otherwise. Although Giovanni denied Plaintiff's request to take vacation in the two weeks preceding her maternity leave, which began on October 3, 2012, he allowed Plaintiff to take eleven days of vacation from October 3, 2012 through October 18, 2012, and then to begin her FMLA leave on October 19, 2012. Plaintiff does not explain why she believes Giovanni acted unfairly, to Plaintiff's detriment, in his handling of her pre-maternity vacation request.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that P&G's actions are indicative of a retaliatory motive. Therefore, Plaintiff has not demonstrated a fact issue with regard to the fourth element of her prima facie case requiring her to show a causal connection between protected conduct and adverse employment action. For that reason, and because Plaintiff has not presented a fact issue on pretext, the Court will grant summary judgment to P&G on Plaintiff's FMLA retaliation claim.

## V. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is **GRANTED** in its entirety.

Dated: April 6, 2015                    s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE


Copies to:

Charlotte Croson, Esq.
Kathleen L. Bogas, Esq.
Michael Aldana, Esq.
Nicholas O. Anderson, Esq.
Timothy H. Howlett, Esq.